IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 7, 2004

# STATE OF TENNESSEE v. THOMAS D. STANTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-A-654     Seth Norman, Judge**

—————————

**No. M2003-03049-CCA-R3-CD - Filed March 17, 2005**

—————————

The Defendant, Thomas D. Stanton, was convicted by a jury of one count of aggravated robbery, one count of carjacking, one count of aggravated burglary, one count of theft, one count of Class D felony evading arrest, and one count of misdemeanor evading arrest. The trial court sentenced him to life imprisonment for the robbery offense; twenty-five years for the carjacking, to run consecutively; twelve years for the burglary offense, to run consecutively; five years for the theft, to run concurrently; ten years for the felony evading arrest, to run concurrently; and eleven months, twenty-nine days for the misdemeanor evading arrest, to run concurrently; for an effective sentence of life plus thirty-seven years. In this direct appeal, the Defendant contends that the evidence does not support his aggravated robbery conviction; that the trial court committed reversible error in failing to charge the jury on certain lesser-included offenses; that the trial court erred in permitting the State to impeach him on the basis of a prior conviction; and that his sentences are excessive. The State also filed a direct appeal, arguing that the Defendant's sentence of life imprisonment for the aggravated robbery conviction is illegal and should be modified to a sentence of life imprisonment without the possibility of parole. We reverse and remand for a new trial the Defendant's conviction of Class D felony evading arrest. We modify the Defendant's sentence for his aggravated robbery conviction to life imprisonment without the possibility of parole. We remand for a correction of the judgment reflecting the Defendant's carjacking conviction. In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., concurred in results only and ROBERT W. WEDEMEYER, J., joined.

Emma Tennent, Nashville, Tennessee, for the appellant, Thomas D. Stanton.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Renee Erb, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The victim, Steve Springer, testified that he moved to Nashville in March 2002 in order to seek employment in the music industry. He arrived in his van and brought with him a keyboard, two guitars, and some recording equipment. He checked into a motel on Dickerson Road and was living there at the time he met the Defendant and Tamika Frierson. Mr. Springer testified that the Defendant and Ms. Frierson were loitering about the motel grounds and they struck up a conversation. The Defendant introduced himself and Ms. Frierson and asked Mr. Springer to drive them to the Defendant's mother's house so that they could get something to eat. Mr. Springer complied. At the residence, Mr. Springer and Ms. Frierson remained in the car while the Defendant entered the house. The Defendant returned with a plate of food for Ms. Frierson and a small rock of crack cocaine. Mr. Springer and Ms. Frierson smoked this cocaine together; the Defendant did not partake of the drug.

The threesome then left the residence and headed back to the motel. On the way, they stopped at a liquor store where the Defendant purchased some alcohol. Upon their return to the motel, the Defendant and Mr. Springer drank vodka and bourbon, with Mr. Springer becoming intoxicated. They discussed obtaining some more cocaine for Mr. Springer to consume. Mr. Springer offered his coffee maker as an item to trade for the drug. All three then left in the van, ostensibly to go get more cocaine.

Mr. Springer testified that he was too drunk to drive, so he gave the van keys to the Defendant and let him drive; Mr. Springer sat in the back of the van. Mr. Springer explained what happened next:

> And next thing I know we stopped somewhere and I got jumped inside the van and they kept asking me for my hotel key and I tried to put them off, you know. What are you doing? And I basically got the crap beat out of me and I seriously thought I was going to die that evening.
> . . .
>     [The Defendant] clobbered me first and knocked me silly, and then I was dragged out of the van and beat repeatedly. And then I was stripped, both my eyes were pretty much swollen shut at this point, I couldn't see a whole lot. I could hear them talking and he was directing Tamika to take off my clothes, I guess to impair me or, I seriously thought the guy was going to kill me. He was beating me in the face, in the legs, dragging me through the mud and in the forest, in the woods here. Beating me on my back with, kicking me or with a stick or something, just non-stop.

-2-

And I must have lost consciousness a couple of times. And next thing I know I'm naked except for my underwear and it's cold, it's wet and I walked away from the somewhat forest area that I was in, but I could barely see. And came across a couple of homes and started pounding on doors and asking for help. And shortly thereafter the police came and took me to the hospital.

The victim testified further about his injuries. He stated that he still has a scar under his left eye, and it was a week and a half following the assault before he could use that eye. He had "a sharp pain" in his back for two months. He described this pain as "excruciating." His knees became so scabbed during the healing process that it was very painful for him to bend his knees, because the scabs would break open and bleeding would occur. Mr. Springer described his injuries as "very, very painful" and explained that, during his recovery, he had to walk very slowly, was unable to carry anything, and the "[b]est [he] could do for several weeks was to lay in one position."

Mr. Springer emphasized that he did not give the Defendant permission to take his room key, his money, his van or any of his musical equipment.

Officer Jason Moyer testified that he was the first officer on the scene of the assault. Officer Moyer stated that, when he arrived, the victim "was running around hysterical in his underwear. He had obviously been beaten up. His eyes were starting to swell shut . . . [h]e was bleeding from his nose, his mouth, he had multiple abrasions and scrapes all over his body." Officer Moyer described the lacerations to the victim's face as "severe," and stated that the victim had been "severely beaten." The victim told Officer Moyer that "they" had "taken his van and . . . all his possessions and stripped him naked and had left him in the road for dead." The victim described his van and also told the officer that his assailants had the key to his motel room. According to Officer Moyer, the crime scene and the motel were only about four to five minutes apart. Relying on the victim's description, Officer Moyer put out a "BOLO" on the van.

In response to the BOLO, Officer William Bishop stationed himself at the motel where the victim had been staying. When the victim's van pulled past him, he followed it down Dickerson Road. When he turned on his lights and siren, the van "took off." Officer Bishop testified that a "very dangerous" pursuit ensued. Eventually, the van hit a curb, lost a tire and ran into a ditch. At that point, the Defendant got out of the van and began running away. With assistance, Officer Bishop was able to subdue the Defendant and take him into custody. He subsequently took the Defendant to the hospital because the Defendant's right hand and wrist were "all swelled up." While at the hospital, the Defendant was put in the same room with the victim. Officer Bishop stated that the victim was "showing signs of extreme physical pain," was "yelling and screaming," and could walk only with assistance.

Officer Jamie Underwood assisted in the pursuit of the van and secured it after the Defendant ran off. She took custody of Tamika Frierson, who was also in the van, and found a credit card belonging to the victim in Ms. Frierson's pocket.

Detective Mike Chastain interviewed the victim in the hospital. Det. Chastain stated that the victim appeared to be in a "considerable amount of pain." The victim told him specifically that the Defendant and Ms. Frierson had assaulted him and taken his van, debit and credit cards, motel key and a small amount of money. The victim subsequently identified the Defendant and Ms. Frierson from photographic line-ups. A couple of days after the attack, Det. Chastain took the victim to the Metro impound lot to identify his van, which he did. Inside the van were the victim's bicycle, two guitars, a keyboard and various other items. Not recovered were the victim's money clip or his motel key card.

Tamika Frierson testified, explaining that she had pled guilty to aggravated burglary and theft as a result of the attack on Mr. Springer. She stated that she and the Defendant had spent the night together at the motel the night before the attack. As they were checking out, it was raining. They had no car and noticed the victim because he had a vehicle. They began a conversation with the victim and asked him to drive them to the Defendant's mother's house. The victim agreed and while they were there, she and the victim smoked some crack cocaine in the van. They all then returned to the motel and all went into the victim's motel room. There, she saw the victim's musical equipment. She stated that the three of them sat around in the victim's room, ate, and drank alcohol. The victim played his musical instruments.

Later, she testified, the victim decided he wanted more cocaine. The three of them left in the victim's van and returned to the Defendant's mother's house, where they tried unsuccessfully to sell the victim's coffee maker to the Defendant's mother. They then drove to another location where they parked and, according to Ms. Frierson, the Defendant "got out of the car and went on [the victim's] side . . . and pulled him out of the car and began beating him." Ms. Frierson stated that the Defendant beat the victim with his fist. The Defendant was asking the victim for the key to his room and when the victim told the Defendant that he did not have it, the Defendant "just kept beating him."

During the beating, the Defendant told Ms. Frierson to strip the victim, which Ms. Frierson did. She also placed her foot on the victim's neck. Afterward, she found the victim's motel key card on the ground. She also took the victim's money clip and a "card." She and the Defendant then got back in the victim's van and returned to the motel. There, they "went and got all the equipment out of the room and loaded it up in the van." The police chase ensued.

Ms. Frierson testified that she and the Defendant determined to take the victim's belongings while they were visiting with the victim in his room after their initial return from the Defendant's mother's house. She stated, however, that she did not know the victim was going to be beaten.

The Defendant also testified. He explained that he and Ms. Frierson had been staying in motels along Dickerson Road "on and off" for two to three weeks. As they were checking out of a motel on March 17, 2002, he saw the victim. He approached the victim and struck up a conversation. He introduced himself and Ms. Frierson, even showing the victim his identification card. He asked the victim for a ride but the victim initially declined. Their conversation continued

and the Defendant repeated his request for a ride, this time offering the victim some food and alcohol. The victim asked if the Defendant could get him some crack. When the Defendant replied in the affirmative, the victim agreed to give him and Ms. Frierson a ride.

The victim drove them to the Defendant's mother's house. There, the Defendant went in, got some food, and also got some crack cocaine from his nephew. He gave the crack to the victim. The Defendant then ran into someone that owed him money, but the Defendant took payment in cocaine, instead. The Defendant, the victim and Ms. Frierson then left in the van. According to the Defendant, the victim was trying to drive and smoke the crack at the same time. The Defendant volunteered to drive and the victim acquiesced. On their way back to the motel, they stopped at a "bootleg house" where the Defendant bought some alcohol. The threesome then returned to the victim's room.

There, they all began drinking. The Defendant asked the victim if he wanted more crack and the victim said yes. They began negotiating a price. The Defendant told the victim that he wanted the victim's guitar and keyboard. The victim refused this trade. The Defendant then offered to double the amount of cocaine in exchange for these items, and the victim then agreed. The Defendant then gave to the victim the cocaine that he had earlier taken in payment for the debt owed him, which was about one-half the amount of cocaine that the victim agreed to trade for his musical equipment. The victim smoked this amount and then wanted the rest. The Defendant testified that, after smoking this second amount of cocaine, the victim was hallucinating and "acting weird." The Defendant also stated that all three of them were drunk.

In order to get the victim the rest of his cocaine, they left again in the van, with the Defendant driving. The Defendant scored the rest of the victim's cocaine and gave it to him. They all then returned to the victim's room. The victim was "acting crazy" and opened the door to his motel room, stating that he was hot. While the door was open, the Defendant saw three men walk by, one of whom appeared to be armed. The Defendant told the victim to shut the door, which the victim did. The victim then began showing the Defendant how to use the keyboard.

According to the Defendant, the victim wanted still more crack and offered to trade his bicycle and coffee maker for it. The Defendant told the victim that they could take the coffee maker to his mother's house, and they agreed to do so. Again, the Defendant drove. On their way back, as the Defendant was maneuvering the van through a tight turn and going very slowly, the victim opened the sliding door of the van and got out. The Defendant testified that the victim then "got jumped." The Defendant did not know who jumped the victim or how many persons were involved. He stated that he "seen a couple of . . . figures" beating the victim. The Defendant got out of the van to see if he could help. When he heard a gunshot, he got back in the van and left.

The Defendant returned to the motel, took the card key that was in the console of the van, and went into the victim's room. He retrieved the keyboard and guitar that the victim had agreed to trade for the cocaine. He put these items in the van. Ms. Frierson then convinced the Defendant that they needed to return to where they had left the victim. On their way, the police began following them. The Defendant became "scared" and fled.

-5-

The Defendant claimed that his hand and wrist became swollen because he was handcuffed too tightly during his arrest. The Defendant maintained that he was not trying to steal anything from the victim.

Following the presentation of this proof, the jury convicted the Defendant of aggravated robbery, carjacking, aggravated burglary, theft, Class D felony evading arrest and misdemeanor evading arrest.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

In his first issue, the Defendant contends that the proof is not sufficient to support his conviction of aggravated robbery. Aggravated robbery is defined as the intentional or knowing theft of property from the person of another by violence or putting the person in fear, whereby the victim suffers serious bodily injury. See Tenn. Code Ann. § 39-13-402(a)(2). "Serious bodily injury" is, in turn, defined as bodily injury which involves a substantial risk of death; protracted unconsciousness; extreme physical pain; protracted or obvious disfigurement; or the protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. See id. § 39-11-106(a)(34). The Defendant argues that the proof did not establish beyond a reasonable doubt that the victim suffered serious bodily injury.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

In making his argument, the Defendant relies upon this Court's opinion in State v. Sims, 909 S.W.2d 46 (Tenn. Crim. App. 1995). In that case, the defendant was convicted of especially aggravated robbery on the basis that he robbed the victim using a deadly weapon and caused the victim to suffer serious bodily injury. See Tenn. Code Ann. § 39-13-403(a). The proof demonstrated that, during the course of the robbery, the defendant struck the victim once in the face with a pistol. From this blow, she suffered a broken and lacerated nose and a bruised cheekbone. She spent about two hours in the hospital receiving immediate treatment for these wounds. She was not prescribed any pain medication. On appeal, the defendant contended that the victim had not suffered the "serious bodily injury" required to support a conviction of especially aggravated robbery. This Court agreed. Using the canon of statutory construction known as ejusdem generis, this Court held that "the pain commonly associated with a broken nose is [not] extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." Sims, 909 S.W.2d at 49. Accordingly, the Court modified the defendant's conviction to aggravated robbery. See Tenn. Code Ann. § 39-13-402(a)(1).

The Defendant now argues that, like the victim in Sims, Mr. Springer did not suffer from the type of "extreme physical pain" necessary to support a finding of "serious bodily injury." We disagree.

The proof at trial established that the Defendant beat the victim severely. Photographs of the victim depicting his injuries were introduced at trial and are included in the record on appeal. The victim suffered numerous blows to his face, back and legs. He was dragged in such a way as to cause large abrasions on both knees. The victim testified that the pain in his back from the beating was "excruciating," and that his injuries were "very, very painful." The victim's medical records from his admission into the emergency room indicate that the victim's "lower back pain is a 9 on scale of 1-10." The victim was administered an injection of Toradol for his pain.[1]

In addition to the pain that he suffered, Mr. Springer testified that he could not use his left eye for a week and a half after the assault. We have no difficulty concluding that the loss of vision from one eye for over a week constitutes a "protracted loss or substantial impairment of a function of a bodily . . . organ." Moreover, the victim also testified that his mobility was seriously limited during the several weeks following the assault. This, too, constitutes "the protracted loss or substantial impairment of a function of a bodily member," that is, the victim's legs and back. Finally, the victim testified that he suffered permanent scarring below his left eye, and the jury had the opportunity to view the victim's face. A scar on the face is an "obvious disfigurement." See State v. Anthony D. Forster, No. M2002-00008-CCA-R3-CD, 2003 WL 1715922, at *10 (Tenn. Crim. App., Nashville, April 1, 2003).

---

[1]According to the Medical Dictionary Online, Toradol is a non-steroidal anti-inflammatory drug used to treat pain.

This Court has previously recognized that "[t]he distinction between bodily injury and serious bodily injury is generally a question of fact for the jury to determine." Id.; see also State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Here, we are satisfied that the proof of the victim's bodily injuries is sufficient to satisfy the definition of "serious" in more than one respect. Accordingly, we hold that the evidence is sufficient to support the Defendant's conviction of aggravated robbery as charged, and this issue is therefore without merit.

## II. LESSER-INCLUDED OFFENSES

In his next issue, the Defendant contends that the trial court erred by failing to charge the jury on certain lesser-included offenses. Specifically, he states that the trial court erroneously failed to charge the jury on the crime of criminal trespass as a lesser-included offense of aggravated burglary, and on the crime of Class E felony evading arrest as a lesser-included offense of Class D felony evading arrest. The State concedes that both of these offenses are "lesser-includeds," but argues that the Defendant is not entitled to relief on the trial court's failure to charge them to the jury.

The question of whether a given offense should be submitted to the jury as a lesser-included offense is a mixed question of law and fact. See State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001). Our standard of review for mixed questions of law and fact is de novo with no presumption of correctness. See id.

Both the United States and Tennessee Constitutions require that one accused of a crime be given fair and reasonable notice of the charges to be defended. See U. S. Const. amend. VI; Tenn. Const. art. I, § 9; Rush, 50 S.W.3d at 427. Concomitant with this right, a criminal defendant may be convicted only of a crime which is raised by the indictment or which is a lesser-included offense thereof. See Rush, 50 S.W.3d at 427; see also Hagner v. United States, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932). In order to determine what is a lesser-included offense of any given indicted offense, we utilize the formula set forth by our supreme court in State v. Burns:

An offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
> > (1) a different mental state indicating a lesser kind of culpability; and/or
> > (2) a less serious harm or risk of harm to the same person, property or public interest; or
> (c) it consists of
> > (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

6 S.W.3d 453, 466-67 (Tenn. 1999).

The determination that an offense is a "lesser-included" one under this paradigm does not automatically entitle the defendant to an instruction, however. See id. at 468 ("[t]he mere existence of a lesser offense to a charged offense is not sufficient alone to warrant a charge on that offense.") Rather, the trial court must continue its inquiry with two more questions:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id. at 469. "If the trial court finds that the offense is lesser-included and the evidence would support a conviction for that offense, then it has a duty to instruct the jury regarding the lesser-included offense." Rush, 50 S.W.3d at 429.

Criminal trespass is a lesser-included offense of aggravated burglary. See State v. Terry, 118 S.W.3d 355, 359 (Tenn. 2003); State v. George Redd, No. W2000-01620-CCA-R3-CD, 2001 WL 912718, at *4 (Tenn. Crim. App., Jackson, Aug. 9, 2001). The Defendant filed a written request that the jury be charged on this offense. See Tenn. Code Ann. § 40-18-110(a). Nevertheless, the trial court declined to instruct the jury on this crime. The Defendant now argues that the trial court committed reversible error in this regard.

Our criminal code provides that "[a] person commits criminal trespass who, knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof." Tenn. Code Ann. § 39-14-405(a). Certainly, the proof adduced in this case supported a jury instruction on this offense. Thus, we have no difficulty in concluding that the trial court erred in refusing to include this jury instruction in its charge.[2]

---

[2]The State argues that the trial court did not err in failing to instruct the jury on criminal trespass because, at the time of the Defendant's trial, it was not yet clear that criminal trespass was a lesser-included offense of aggravated burglary. The State bases its argument on our supreme court's analysis of plain error in Terry. Here, because the Defendant both requested the instruction at trial and raised the issue in his motion for new trial, a plain error analysis is inapposite.

We review a trial court's erroneous failure to provide a lesser-included offense instruction under the constitutional harmless error standard: that is, in order to avoid reversal, we must determine that the error was harmless beyond a reasonable doubt. See State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001). See also State v. Bowles, 52 S.W.3d 69, 77 (Tenn. 2001) ("because a failure to give lesser-included offense instructions is of constitutional dimensions, it 'is "presumed" reversible; it will result in reversal unless the State convinces the reviewing court beyond a reasonable doubt that the error did not affect the outcome of the trial.'") In conducting this inquiry, "the reviewing court must determine whether a reasonable jury would have convicted the defendant of the lesser-included offense instead of the charged offense." State v. Richmond, 90 S.W.3d 648, 662 (Tenn. 2002). That is, "the reviewing court must determine whether it appears beyond a reasonable doubt that the trial court's failure to instruct on the lesser-included offense did not affect the outcome of the trial." Id. "In making this determination, a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002).

The Defendant was charged in this case with aggravated burglary on the basis that he entered the victim's habitation with the intent to commit a theft. See Tenn. Code Ann. § 39-14-403(a). The Defendant argues that the jury could have convicted him of criminal trespass instead of aggravated burglary on a finding "that the State failed to establish beyond a reasonable doubt that [he] entered the victim's motel room intending to steal the victim's property." However, the jury convicted the Defendant not only of aggravated burglary, but also of theft. Given that the jury convicted the Defendant of theft, we conclude beyond a reasonable doubt that it would not have convicted the Defendant of criminal trespass rather than aggravated burglary had it been given the opportunity to do so. In other words, we have determined beyond a reasonable doubt that the trial court's failure to instruct the jury on the lesser-included offense of criminal trespass did not affect the outcome of the Defendant's trial. The Defendant is therefore entitled to no relief on this issue.

The Defendant also contends that the trial court committed reversible error by failing to charge the jury properly with respect to his charge of Class D felony evading arrest. Our criminal code provides that "[i]t is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from such officer to bring the vehicle to a stop." Id. § 39-16-603(b)(1). Where the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties, the offense of evading arrest is a Class D felony. See id. § 39-16-603(b)(3). If the flight or attempt to elude does not create such a risk of death or injury, the offense of evading arrest is a Class E felony. See id. The Defendant was charged with Class D evading arrest.

As recognized by the State, Class E evading arrest is a lesser-included offense of Class D evading arrest. See State v. Kerry L. Dowell, No. M2002-00630-CCA-R3-CD, 2003 WL 21486978, at *16 (Tenn. Crim. App., Nashville, June 27, 2003); State v. Gregory Dunnorm, No. E2001-00566-CCA-R3-CD, 2002 WL 1298770, at *10 (Tenn. Crim. App., Knoxville, June 12, 2002). The evidence in this case was such that reasonable minds could find that the Defendant committed Class E evading arrest, and that evidence is legally sufficient to support a conviction of same. Accordingly, the trial court erred in failing to instruct the jury on Class E evading arrest.

The State argues that, notwithstanding the trial court's error, the Defendant is not entitled to relief because he failed to raise this issue in his motion for new trial. See Tenn. R. App. P. 3(e) ("in all cases tried by a jury, no issue presented for review shall be predicated upon error in the . . . jury instructions granted or refused . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.") The Defendant responds that we should review the trial court's error under the doctrine of "plain error." See Tenn. R. Crim. P. 52(b) ("An error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice.")

> In order to find plain error, we must consider five factors:
> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Taking these factors in sequence, the record, which contains a transcription of the trial court's charge to the jury, clearly establishes that the trial court did not charge the jury on the lesser-included offense of Class E felony evading arrest. Second, the failure to charge a jury with all lesser-included offenses required under the evidence breaches a clear and unequivocal rule of law. Third, a criminally accused's right to have the jury charged on all lesser-included offenses embraced by the evidence is a constitutionally protected right, and is adversely affected when the jury is not given the opportunity to convict on a lesser rather than on a greater offense. Fourth, the record is devoid of any evidence that the Defendant waived his right to a complete jury instruction for tactical reasons. Fifth, we consider the trial court's infringement on the Defendant's right to a complete jury charge to be sufficiently serious as to require our review in order to do substantial justice. Accordingly, we will review the trial court's error in this regard in spite of the Defendant's failure to raise it in his motion for new trial.

We have already concluded that the trial court erred in failing to instruct the jury on Class E felony evading arrest. We must now determine whether that error was harmless beyond a reasonable doubt. We conclude that it was not.

Officer Bishop testified that, after he turned on his blue lights while following the Defendant, the Defendant turned onto a city street and "accelerated away," reaching speeds of "up to maybe 60 miles an hour." Officer Bishop stated that the Defendant "ran through at least one four-way stop," and that he considered terminating the pursuit because "it had been raining heavily and the roads were extremely wet and it was very dangerous to be chasing him and he wasn't, had no regard for the public at large at all." Officer Bishop continued his description of the chase:

> We got to Gallatin Pike, he went right through a red light across Gallatin Pike, didn't slow down. Nearly hit a car driving up Gallatin. We crossed Gallatin,

-11-

he hit a curb on the far side and when he hit the curb, the right front rear, the tire completely came off the vehicle. He went down on three wheels, kept on driving on three wheels. We chased him for approximately another mile. He went through another four-way stop there . . . .

Officer Bishop stated later that, in conjunction with his running the red light across Gallatin Pike, the Defendant "nearly killed" someone.

This testimony certainly offered sufficient proof for the jury to convict the Defendant of Class D felony evading arrest. Moreover, this proof was uncontroverted. However, our supreme court has made clear that

[t]he trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the theories of the parties, controls whether an instruction is required.

Allen, 69 S.W.3d at 187-88. The Court continued:

The jury is not required to believe any evidence offered by the State. . . . We therefore cannot agree that the decision to convict on a lesser-included offense may be taken away from the jury whenever proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted. As we stated in Burns, "the jury, not the judge, performs the function of fact-finder."

Id. at 189.

The jury in this case was given no opportunity to determine that the Defendant evaded arrest in a manner that did not create a risk of death or injury to third parties. Although three witnesses—Officer Bishop, Ms. Frierson and the Defendant himself—testified that the Defendant fled from the police, only one witness testified as to the alleged dangers the Defendant thereby created. Yet, the jury was given no opportunity to believe the testimony about the chase while rejecting the testimony about the alleged dangers. Further, unlike the Defendant's conviction of aggravated burglary which is supported by the independent conviction of theft, the jury's verdict contains no separate indication that it accepted Officer Bishop's testimony about the risks created by the Defendant's flight. To the contrary, the jury's verdict contains a clear indication that it found Officer Bishop less than one hundred percent credible. The Defendant was charged in this case with resisting arrest. Officer Bishop testified that, after he and his assisting officer caught the Defendant, they "still had to fight him to the ground. Fight him in the handcuffs and he resisted being led back to [the] patrol car." The only other testimony on this issue was the Defendant's. The Defendant denied that he fought or wrestled with Officer Bishop. The jury acquitted the Defendant of resisting arrest, apparently accrediting the Defendant's testimony on this matter over Officer Bishop's. Therefore, we are unable to conclude beyond a reasonable doubt that the trial court's failure to instruct on the offense of Class E felony evading arrest did not affect the outcome of the Defendant's

trial. Accordingly, we must reverse the Defendant's conviction of Class D felony evading arrest and remand this charge for a new trial.

## III.  IMPEACHMENT BY PRIOR CONVICTION

In his third issue, the Defendant asserts that the trial court erred by permitting the State to impeach him with proof of a 1996 conviction for attempted especially aggravated robbery. Rule 609 of our Rules of Evidence governs the admissibility of prior convictions for impeachment purposes. In pertinent part, the Rule provides that, prior to the accused taking the witness stand, the trial court "upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). With respect to this provision, our supreme court instructs us that,

> [i]n determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues, two criteria are especially relevant. A trial court should first analyze the relevance the impeaching conviction has to the issue of credibility. Trial courts should explain on the record how the impeaching conviction is relevant to the defendant's credibility. If the conviction is probative of the defendant's credibility, the trial court should secondly "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged. Accordingly, the unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried. Therefore, trial courts should carefully balance the probative value of the impeaching conviction on credibility against its unfairly prejudicial effect on substantive issues.

State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999) (citations omitted). Our supreme court has also recognized that robbery is a crime involving dishonesty that may be used for impeachment purposes. See State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999). Moreover, "the fact that a prior conviction involves a similar crime for which the defendant is being tried does not automatically require its exclusion." State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997).

In this case, the trial court first determined that credibility was a key issue because the Defendant claimed during opening statement that other persons had beat the victim. The court then determined that "the probative value of the [prior] conviction with regard to credibility . . . would outweigh the prejudicial effect." Accordingly, the trial court ruled that the State would be allowed to impeach the Defendant with proof of his 1996 conviction for attempted especially aggravated robbery. We review this decision by the trial court under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

The trial court's ruling contains an implied finding that the Defendant's prior conviction of attempted especially aggravated robbery was highly relevant as to his credibility. We agree with the trial court in this regard. As set forth above, robbery offenses involve dishonesty and are therefore probative of the perpetrator's credibility. See State v. Stout, 46 S.W.3d 689 app. at 716 (Tenn. 2001) (noting that the trial court, in making a Rule 609 ruling, "correctly determined that especially aggravated robbery is a crime of dishonesty, and is therefore probative of the defendant's credibility.") As pointed out by the Defendant, the trial judge then simply concluded that the probative value of the prior conviction outweighed its prejudicial effect, without explicitly assessing the similarity between the prior conviction and the crime for which the Defendant was being tried, and without setting forth on the record the balancing process he utilized or the reasons underpinning his conclusion.

There is, obviously, a high degree of similarity between the crimes of attempted especially aggravated robbery and aggravated robbery, the crime for which the Defendant was being tried. Thus, the risk of the jurors using the prior conviction as propensity evidence was higher than if the Defendant had been previously convicted of, for instance, fraud. Nevertheless, we decline to hold that the trial court abused its discretion by allowing the Defendant to be impeached with his prior conviction. This Court has previously found no abuse of discretion where the trial court admitted evidence of prior convictions for similar crimes where the accused made his credibility an important issue by denying any wrongdoing and asserting legitimate conduct. See Blevins, 968 S.W.2d at 893. In this case, the Defendant claimed both that he did not beat the victim, and that he had the victim's property under a claim of right. The Defendant put his credibility squarely on the line by denying that he had committed the crimes with which he was charged, and his prior conviction was highly indicative of his willingness to engage in dishonest behavior. Accordingly, while the trial court should have set forth the reasons for its ruling with more care and explicitness, we hold that the trial court did not abuse its discretion in allowing the State to impeach the Defendant with proof of his 1996 conviction for attempted especially aggravated robbery. This issue is without merit.

The Defendant also complains that the trial court did not instruct the jury that proof of the Defendant's prior conviction was to be considered only for its impact on the Defendant's credibility. However, the Defendant made no complaint about this omission at trial. This issue is, accordingly, waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

## IV. SENTENCING

Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five years for the carjacking offense; "life" for the aggravated robbery; twelve years for the aggravated burglary; five years for the theft; ten years for the Class D felony evading arrest; and eleven months, twenty-nine days for the Class A misdemeanor evading arrest. The sentences for the first three of these crimes were ordered to be served consecutively, for an effective sentence of "life" plus thirty-seven years. Both the State and the Defendant have appealed aspects of the Defendant's sentence.

**A. Repeat violent offender status.**

We will first address that portion of the Defendant's sentence which has been appealed by both parties: the trial court's imposition of a "life" sentence for the aggravated robbery conviction. The Defendant contends that he should not be sentenced to any form of a "life" sentence. The State asserts that this sentence is void and illegal because it directly contravenes a statutory requirement that the Defendant be sentenced to "life without the possibility of parole" for his aggravated robbery conviction. The State relies on Tennessee Code Annotated section 40-35-120, which deals with repeat violent offenders. According to that provision of our criminal code, a "repeat violent offender" includes a defendant who has been convicted of aggravated robbery, and who has at least two prior convictions that are classified as violent offenses. See Tenn. Code Ann. § 40-35-120(a), (b)(1)(I). At the Defendant's sentencing hearing, the State introduced certified copies of a 1986 judgment of conviction against the Defendant for rape; a second 1986 judgment of conviction against the Defendant for rape; and a 1996 judgment of conviction against the Defendant for attempted especially aggravated robbery. Rape and attempted especially aggravated robbery are both classified as violent offenses for the purposes of determining repeat violent offender status. See id. § 40-35-120(b)(1)(D), (J). Accordingly, the State argues, the Defendant satisfies the definition of "repeat violent offender." As such, the State contends, the trial court was statutorily required to sentence the Defendant for his aggravated robbery conviction "to imprisonment for life without possibility of parole." Id. § 40-35-120(g).

Following the trial court's imposition of a "life" sentence for the Defendant's aggravated robbery conviction, the State filed a motion "to correct void and illegal sentence" based upon the above reasoning. The trial court denied the State's motion, finding it

> has never found that the defendant is a repeat violent offender by [sic] a reasonable doubt as required under T.C.A. 40-35-120(g), and thus is not required to sentence him to life without the possibility of parole. Furthermore, the defendant is faced with an effective sentence of life plus 37 years. He is almost 37 years old at the present time, thus making the difference between a life sentence and a sentence of life without the possibility of parole inconsequential.

In this Court, the State contends that, in so ruling the trial court abused its discretion. The Defendant responds that, because the trial court failed to find him to be a repeat violent offender, he is not subject to any sort of "life" sentence, but must be sentenced within his appropriate range, which he asserts is Range II, multiple offender. This status would subject the Defendant to a sentence of between twelve and twenty years for the Class B felony of aggravated robbery. See Tenn. Code Ann. § 40-35-112(b)(2).

Initially, we note that the disputed section of our criminal code provides that a trial court's finding of whether a defendant is or is not a repeat violent offender is appealable by either party. See id. § 40-35-120(h). Clearly, then, this Court has the authority to determine the Defendant's status notwithstanding the trial court's previous failure to find beyond a reasonable doubt that the Defendant is a repeat violent offender.

The State introduced certified copies of the Defendant's prior violent felonies at the sentencing hearing. The Defendant did not object to this proof; moreover, defense counsel stated on two occasions that the defense would not be putting on any rebuttal proof. As a result, the State's evidence of the Defendant's repeat violent offender status was uncontroverted and more than sufficient to support a finding beyond a reasonable doubt that the Defendant is a repeat violent offender as defined in the relevant statutory provision. As such, the trial court was required to impose a sentence of life imprisonment without the possibility of parole as to the Defendant's aggravated robbery conviction. The trial court erred in failing to do so, and we therefore modify the Defendant's sentence for his aggravated robbery conviction to life imprisonment without the possibility of parole.

## B.  Length of sentences

The Defendant also complains that his remaining sentences are too long as a result of the trial court's misapplication of enhancement factors. Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b); State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act, and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

While not relied upon by the Defendant, we are compelled to address this issue in light of the United States Supreme Court's recent opinion in Blakely v. Washington, 542 U.S. __, 124 S.Ct. 2531 (2004). In Blakely, the high court struck down a provision of the Washington state sentencing guidelines, quite similar to the one in Tennessee, that permitted the trial judge to impose an "exceptional sentence" after the court made a post-trial determination that certain statutory enhancement factors existed. The Supreme Court determined that, other than upon the basis of a defendant's prior convictions, the protections in the Sixth Amendment to the federal constitution allow a defendant's sentence to be increased by the trial court only where the enhancement factors are based on facts reflected in the jury verdict or admitted by the defendant. See id., 124 S.Ct. at 2537. The Court concluded that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id., at 2543. The Blakely decision calls into question the validity of Tennessee's sentencing statutes, insofar as they permit trial courts to increase a defendant's presumptive sentence based upon enhancement factors found by a trial judge as opposed to findings made by a jury.

We turn now to the Defendant's specific felony sentences.[3] As to the Defendant's carjacking conviction, we first note that there is significant confusion in the record concerning the Defendant's sentence for this offense. The prosecuting attorney represented to the trial court that the Defendant was a "multiple offender" as to this offense on the basis of his prior convictions. See Tenn. Code Ann. § 40-35-106(a)(1). In this, the assistant district attorney was mistaken. Carjacking is a Class B felony. See id. § 39-13-404(b). The Defendant has three prior Class B felony convictions: two rapes and one attempted especially aggravated robbery. See id. §§ 40-35-118; 39-13-403(b); 39-12-107(a). A criminal defendant being sentenced for a Class B felony who has three prior Class B felony convictions is a "persistent offender." See id. § 40-35-107(a)(2); State v. Blouvet, 965 S.W.2d 489, 494 (Tenn. Crim. App. 1997). A persistent offender "shall receive a sentence within Range III." See Tenn. Code Ann. § 40-35-107(c). The Range III sentence for a Class B felony is twenty to thirty years, see id. § 40-35-112(c), and the presumptive sentence is the minimum in the range. See id. § 40-35-210(c).

During the sentencing hearing, the trial judge initially stated that he was sentencing the Defendant as a persistent offender to twenty-five years for the carjacking offense. The prosecuting attorney then told the court that the Defendant was a multiple, Range II offender, and the trial court then revised the Defendant's sentence to fifteen years at thirty-five percent: a Range II sentence. See id. § 40-35-112(b)(2). Nevertheless, the written judgment entered against the Defendant on the carjacking offense indicates that he was sentenced to twenty-five years at thirty-five percent as a "multiple" offender.

As set forth above, the Defendant is properly classified as a "persistent" offender as to his carjacking conviction. He is therefore subject to a sentence of twenty years, enhanced as appropriate up to the maximum of thirty years. See id. § 40-35-210(d). The trial court found that two enhancement factors apply: the Defendant's "previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," and his "previous history

---

[3] The Defendant does not complain about his misdemeanor sentence and we therefore need not address it.

of unwillingness to comply with the conditions of a sentence involving release in the community." Id. § 40-35-114(2), (9). With respect to factor (2), the Defendant's criminal convictions other than those necessary to establish his range consist of the fraudulent use of a credit card, two counts of unlawful possession of a weapon, and numerous misdemeanors. The Defendant also admitted at trial that he had engaged in drug trafficking. The trial court made no findings with respect to the amount of weight it accorded this enhancement factor.

With respect to factor (9), the Defendant argues that the trial court misapplied this factor under this Court's opinion in State v. Hayes, 899 S.W.2d 175 (Tenn. Crim. App. 1995). We find it unnecessary to address this contention because the record demonstrates beyond a reasonable doubt that the Defendant committed the instant offenses while on parole from his sentence for his 1996 attempted especially aggravated robbery conviction.[4] Accordingly, the trial court should have applied this factor to enhance the Defendant's sentence. See Tenn. Code Ann. § 40-35-114(14)(B).

We recognize, of course, that the application of this factor might be cause for a finding of error under Blakely, because it is based on facts neither found by the jury nor admitted by the Defendant. However, this Court has previously held that Blakely violations are subject to a constitutional harmless error analysis. See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *24 (Tenn. Crim. App., Nashville, Nov. 30, 2004). That is, a court's application of an enhancement factor may stand, even when it is based on facts not found by the jury or admitted by the defendant, where we are convinced beyond a reasonable doubt that a jury would have found the existence of the enhancement factor, had it been presented with the proof of same. Here, we have no difficulty in concluding beyond a reasonable doubt that the jury would have concluded that the Defendant committed the instant offenses while on parole. The evidence of the Defendant's prior conviction and sentence was uncontroverted and proves beyond a reasonable doubt that the Defendant was on parole at the time he committed the instant crimes. Application of this factor therefore entitles the Defendant to no relief.

Accordingly, the Defendant's sentence for carjacking was properly enhanced on the basis of two factors. The trial court found no mitigating factors, and the Defendant does not argue error in this regard. We find that the Defendant's midrange sentence for this offense is appropriate under the circumstances. Accordingly, we affirm the Defendant's twenty-five year sentence for his carjacking conviction. We further remand this matter to the trial court to correct the judgment reflecting the Defendant's carjacking conviction so as to indicate that the Defendant is a persistent offender with a release eligibility of forty-five percent.

We turn now to the Defendant's sentence for aggravated burglary. Aggravated burglary is a Class C felony. See Tenn. Code Ann. § 39-14-403(b). Based on all of his prior felony convictions, the Defendant is a "persistent offender" with respect to this offense, see id. § 40-35-107(a)(1), and is therefore subject to a Range III sentence. See id. § 40-35-107(c). The Range III sentence for a

---

[4]The certified copy of the judgment of this conviction provides that the Defendant was sentenced to eleven years in the Department of Correction on February 2, 1996, and was accorded approximately six months of pretrial jail credit. The instant offenses were committed in March 2002, long before the Defendant's sentence expired.

Class C felony is ten to fifteen years.  See id. § 40-35-112(c)(3).  The trial court sentenced the Defendant for this crime to a term of twelve years, using the same enhancement factors as it applied to the carjacking offense.  The presumptive sentence for a Class C felony is the minimum in the range, see Tenn. Code Ann. § 40-35-210(c), in this case, ten years.  The presumptive sentence may be increased as appropriate upon a finding of applicable enhancement factors.  See id. § 40-35-201(d).  Here, although all of the Defendant's prior felony convictions[5] are necessary to establish his range status of persistent offender, see id. § 40-35-107(a)(1), further enhancement of his sentence is appropriate on the basis of his numerous previous misdemeanors and his admitted drug trafficking.  Enhancement on the basis of his parole status at the time he committed the offense is also appropriate.  A two year increase over the minimum sentence is, we hold, a proper enhancement on the basis of two enhancement factors and no mitigating factors.  Accordingly, we affirm the Defendant's sentence for his aggravated burglary conviction.

The Defendant was also convicted of theft over $500 and under $1000, a Class E felony.  See id. § 39-14-105(2).  With respect to this conviction, the Defendant is also a persistent offender.  See id. § 40-35-107(a)(1).  The Range III sentence for a Class E felony is four to six years.  See id. § 40-35-112(c)(5).  The trial court imposed a midrange sentence of five years, apparently relying again on enhancement factors (2) and (9).  As with the Defendant's conviction for aggravated burglary, all of his previous felony convictions are necessary to establish his status as a persistent offender with respect to his theft conviction.  Some further enhancement on that basis is appropriate based on his other criminal history.  Further, enhancement on the basis of the Defendant's status at the time he committed the crime is also appropriate. We therefore affirm the Defendant's mid-range sentence for his theft conviction.

Because we have reversed and remanded for retrial the Defendant's Class D felony evading arrest conviction, we need not address the sentence he received for that offense.

### 3. Consecutive sentencing

Finally, the Defendant complains that the trial court erred in ordering partially consecutive sentences.  The trial court ordered the Defendant's sentences for his carjacking and aggravated burglary convictions to run consecutively to each other and to the sentence for his aggravated robbery conviction on the basis of the following five statutory criteria:

> [a] [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
> [b] [t]he defendant is an offender whose record of criminal activity is extensive;
> [c] [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to

---

[5]The Defendant has a total of six prior felonies:  one fraudulent use of a credit card, two unlawful weapon possessions, two rapes, and one attempted especially aggravated robbery.  However, because the two weapon possessions occurred on the same day, these two convictions are counted as one for purposes of determining the Defendant's sentencing status.  See Tenn. Code Ann. § 40-35-107(b)(4).

sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to the consequences;

[d] [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high; and
[e] [t]he defendant is sentenced for an offense committed while on probation.

Tenn. Code Ann. § 40-35-115(b)(1), (2), (3), (4), (6). Consecutive sentences may be ordered where the court finds any of these criteria to exist "by a preponderance of the evidence." Id. § 40-35-115(b). In this case, there is no proof in the record to support application of the third and final of these five criteria, and the trial court erred in ordering consecutive sentencing on these bases. We further find insufficient proof to support application of the first of these criteria.

We turn now to the propriety of the second of these factors, that the defendant is an offender whose record of criminal activity is extensive. We hold that the record contains sufficient evidence to support consecutive sentences on this basis. Prior to committing the instant offenses, the Defendant had been convicted of six felonies, three of them violent. The Defendant's record also contains numerous misdemeanors. The Defendant also admitted at trial that he sold drugs, additional criminal activity that is not otherwise reflected in the Defendant's history of convictions. Combined with the instant six offenses, the Defendant has a record of extensive criminal activity.

We also conclude that the Defendant meets the definition of "dangerous offender." The Defendant severely beat Mr. Springer and left him stripped and virtually naked on the side of a road. This is conduct which indicates little or no regard for human life. Moreover, the Defendant showed no hesitation whatsoever in assaulting Mr. Springer in such manner as to create a high risk to his life.

We recognize, of course, that even where the imposition of consecutive sentences is supported by the proof, additional considerations must be taken into account. Specifically, the Criminal Sentencing Reform Act of 1989 provides that the overall sentence imposed "should be no greater than that deserved for the offense[s] committed," that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and that the defendant's potential for rehabilitation must be taken into account. Tenn. Code Ann. § 40-35-103(2), (4), (5). See also State v. Lane, 3 S.W.3d 456, 460 (Tenn. 1999). We are further advised that "the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved." Tenn. Code Ann. § 40-35-115 Sentencing Commission Comments. With respect to the Defendant's status as a "dangerous offender," the proof must also establish that the effective sentence is necessary in order to protect the public from further criminal acts by the Defendant. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

Here, the Defendant's effective sentence is life without the possibility of parole plus thirty-seven years. This sentence is the result of the Defendant's ongoing course of extremely violent crimes against multiple persons and his obvious unwillingness to abandon his anti-social conduct even during and after rehabilitation attempts. The Defendant's attack against his most recent victim

was vicious and unprovoked. Clearly, the general public needs protection from the Defendant, and he therefore needs to be isolated from the general public for the rest of his life. The severity of the Defendant's crimes, and his total lack of rehabilitative potential, demand a severe sentence. Accordingly, we affirm the trial court's imposition of partially consecutive sentences.

## CONCLUSION

We reverse the Defendant's conviction for Class D felony evading arrest and remand that charge for a new trial. We modify the Defendant's sentence for his aggravated robbery conviction to life without the possibility of parole. We direct the trial court to correct the judgment reflecting the Defendant's carjacking conviction to indicate that he is a persistent offender as to that crime, with a release eligibility of forty-five percent. In all other respects, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE